Ann Hisky CLEVELAND, Kristine M. Fardig, Robert L. Head, and Pamela Sigfried, Appellants,

v.

MUNICIPALITY OF ANCHORAGE, Appellee.

No. 4956.

Supreme Court of Alaska.

July 24, 1981.

---

Wayne Anthony Ross and Donald J. Miller, Miller & Ross, Anchorage, and Patrick Monoghan, Idaho, for appellants.

Elaine Vondrasek, Asst. Municipal Prosecutor, Allen M. Bailey, Municipal Prosecutor, and Theodore D. Berns, Municipal Atty., Anchorage, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.*

## OPINION

RABINOWITZ, Chief Justice.

The facts underlying the four criminal convictions appealed from in this case are not in dispute.

On January 6, 1978, members of various anti-abortion groups staged a nationwide protest. In conjunction with that movement, members of Alaska Right to Life staged a demonstration outside of the building housing the Alaska Hospital and the Alaska Clinic in Anchorage. Having decided that they had "tried everything else" and that it was necessary "to try . . . peacefully to stop the taking of human life," appellants Head, Fardig, Sigfried and Cleveland entered the Alaska Clinic to conduct a more emphatic protest than the one in progress outside the building. Head and Siegfried proceeded to attach themselves to the door of the Clinic's operating room with handcuffs and chains, while Cleveland and Fardig handcuffed themselves to the operating table.

Shortly after appellants had established themselves in the Clinic, Mingo, the building security supervisor, asked them to leave and then, in response to their refusal, obtained a set of boltcutters. Mingo first cut the handcuffs connecting Head and Sigfried to the door and escorted them from the building. He then returned and, overcoming relatively minor resistance, freed Fardig and Cleveland. Fardig was escorted outside and Cleveland, who refused to walk, was carried out on a sheet. All four were advised not to return unless they needed medical assistance.

Moments later, appellants re-entered the building and again approached the operating room; Mingo stopped them and again requested them to leave. Fardig, Cleveland and Siegfried then sat down on the floor, while Head removed himself to the building's main entrance and sat down there. At that point, city police were summoned. All four appellants were once again requested to leave the premises, and on refusing to do so, were arrested and then removed by police officers.

Appellants were each charged with violating Anchorage's criminal trespass ordi-

---

* Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

nance[1] and all were convicted under that ordinance in the district court. The convictions were affirmed on appeal to the superior court, and are now before us on appeal from the superior court's affirmance.

Appellants' primary defense at trial was to have depended on the claim that their actions were necessary to avert imminent peril to human life. They allege error in the district court's refusal to instruct the jury on the defense of necessity. Although the trial court excluded that defense, it did allow appellants to defend on the ground that they acted under an honest and reasonable, but mistaken, belief that the necessity defense would protect them from criminal prosecution for their actions. They allege error on the ground that the instructions given on this latter defense were so "confusing and contradictory" as to require reversal. Appellants also seek reversal on the ground that the criminal complaints relied on by the state were defective and on the ground that the cumulative impact of the alleged errors deprived them of their due process rights under the United States Constitution and the Alaska Constitution.

## I.

## DEFECTS IN THE COMPLAINTS.

■ Appellants argue that the criminal complaints in this case were defective in two respects. First, Fardig, Cleveland and Sigfried claim that they were arrested in the Alaska Clinic rather than the Alaska Hospital as alleged in each of the complaints. Second, pointing to the literal language of the Anchorage trespass ordinance,[2] appellants contend that they were not in violation of that ordinance because the person who requested them to leave the building was not an "owner or occupant thereof."

Under Alaska Dist.Ct.R.Crim.P. 1(a),[3] a complaint constitutes the accusatory pleading by which an offense is charged in a district court proceeding; it serves the same function as does an indictment or information in the superior court. Under Alaska R.Crim.P. 7(c),[4] a mere formal defect does not render an indictment insufficient unless it is of a magnitude sufficient to prejudice substantial rights of the defendant. Alaska Dist.Ct.R.Crim.P. 1 directs application of the general Criminal Rule provisions to district court proceedings "[w]herever practicable." In the present case, three of the four complaints were

---

1. Anchorage Municipal Code 8.30.010 reads, in pertinent part, as follows:

    *Trespass—Posting of property—Penalty*
    A. It is unlawful for any person, firm or corporation to commit a trespass upon either public or private property without consent of the owner of the property.
    B. Without constituting any limitation upon the provisions of subsection A hereof, any of the following acts by any person, firm or corporation shall be deemed included among those that constitute trespasses in violation of the provisions of subsection A, and appropriate action may be taken hereunder at any time, or from time to time, to prevent or punish any violation or violations of this section.
    The aforesaid enumerated acts shall include:
    . . . .
    2. the pursuit of any course of conduct or action upon the land of another in violation of a notice posted or exhibited at the main entrance to the premises or at any point of approach or entry, or in violation of any notice, warning or protest given orally or in writing by any owner or occupant thereof;

3. a failure or refusal to depart from the premises of another, including publicly owned property, upon request to do so orally or in writing by any owner or occupant thereof; . . . .

2. Appellants rely on Anchorage Municipal Code 8.30.010(B)(3), under which "a failure or refusal to depart from the premises of another, including publicly owned property, upon request to do so orally or in writing by any owner or occupant thereof" constitutes a trespass.

3. Alaska Dist.Ct.R.Crim.P. 1(a) reads, in part: "A criminal action is commenced by the filing of a complaint."

4. Alaska R.Crim.P. 7(c) reads, in part:
    No indictment is insufficient, nor can the trial, judgment or other proceedings thereon be affected by reason of a defect or imperfection in matter of form in the indictment, which does not tend to prejudice the substantial rights of the defendant.

formally defective in that they alleged that the trespasses occurred in the Alaska Hospital rather than in the Alaska Clinic where they actually did occur. Appellant Head admits that he was arrested for trespassing in the Alaska Hospital as alleged. Both facilities, however, were in fact contained within a single building. Since no prejudice to any appellant is claimed, and since we can perceive none that could be claimed, this asserted defect did not warrant dismissal of the subject complaints. *See Price v. State*, 437 P.2d 330, 332 (Alaska 1968).

■ Appellants' second attack on the sufficiency of the complaints is that Anchorage Municipal Code 8.30.010(B)(3)[5] requires that a trespasser be requested to depart from the premises by an "owner or occupant" before he can be found to have violated that ordinance. Mingo, the security supervisor for the whole Hospital-Clinic building, was, according to appellants, neither an owner nor an occupant of the building and therefore was not qualified to request them to leave.

Beyond his statements that he was "the building security supervisor" and that he was "employed by the Teamster[s] Union, Local 959," there is nothing in the record to indicate the precise nature of Mingo's employment arrangement with the Hospital or Clinic. Appellants' attack, however, is not based on the extent of Mingo's authority to act on behalf of the Clinic; it depends, rather, on a very literal reading of the trespass statute.[6] Appellants' claim assumes without argument that under the ordinance, an "owner or occupant" can never make the request that trespassers depart by acting through an agent. In the absence of argument or authority to the contrary, we see no reason for suspending the general common law of agency in construing section 8.30.010(B)(3) of the Anchorage Municipal

Code. Other courts have reasoned similarly. *See Johnson v. State*, 277 Ala. 655, 173 So.2d 824, 827–28 (1965); *People v. Thompson*, 56 Ill.App.3d 557, 14 Ill.Dec. 312, 372 N.E.2d 117, 121–22 (1978). The record indicates that Mingo was a duly authorized agent of an "owner or occupant" of the Clinic acting within the scope of his employment, and his request that appellants leave the premises therefore satisfied the requirements of Anchorage Municipal Code 8.30.-010(B)(3). Thus we also reject this facet of appellants' attack on the sufficiency of the complaints.

## II.

### THE DEFENSE OF NECESSITY.

Appellants' primary claim is that in attempting to prevent the performance of abortions at the Alaska Clinic, they acted in the reasonable belief that their actions were necessary to protect human life from imminent peril. In spite of both argument and testimony offered at trial that is in apparent conflict with their present position, appellants now insist that:

It is vital to understand that these appellants, by their actions on January 6, 1978, were not protesting abortion in general, or engaging in symbolic acts which they hoped would lead the public to sympathize with the prolife cause. Rather, they were directly intervening to protect the particular human lives threatened with imminent destruction at Alaska Hospital and Clinic in the abortion chambers they entered, on that very day.

In support of their position appellants cite newspaper articles[7] describing two unreported Fairfax County, Virginia, district court cases[8] in which trespassers in an abortion clinic were acquitted on this theory.

---

5. *See* note 2 *supra*.

6. Appellants define "occupant" to mean "one having possession" of the premises.

7. J. Beck, *Success in Trespass Gives Right-to-Lifers a Legal Lift*, The Washington Star, October 19, 1977, at B1; M. Weil, *Va. Abortions*

*Law Held Unconstitutional*, The Washington Post, February 11, 1978, at B3.

8. *County of Fairfax v. Gaetano*, No. 13974 (Gen.Dist.Ct. of Fairfax County, Va., October 17, 1977); *County of Fairfax v. Smith*, No. ___ (Gen.Dist.Ct. of Fairfax County, Va., February 11, 1978).

■ The defense of necessity requires a showing of three essential elements: 1) The act charged must have been done to prevent a significant evil; 2) there must have been no adequate alternative; 3) the harm caused must not have been disproportionate, to the harm avoided.[9] It is available if the accused reasonably believed at the time of acting that the first and second elements were present, even if that belief was mistaken; but the accused's belief will not suffice for the third element. An objective determination must be made as to whether the defendant's value judgment was correct, given the facts as he reasonably perceived them. *Nelson v. State*, 597 P.2d 977, 979, 980 n.6 (Alaska 1979).

Relying heavily on *State v. Marley*, 54 Haw. 450, 509 P.2d 1095 (1973), the district court refused to allow the jury to consider the defense of necessity. Appellants argue that their presence "prevented the killing of children which was imminent" because "the potential victims and their mothers could not be brought to the abortion chambers through hallways and doors which the appellants were blocking."

■ There are several flaws in appellants' argument. First, the emergency which produces the "necessity" behind the charged act must generally be a result of the "physical forces of nature." W. LaFave & A. Scott, *Criminal Law* § 50, at 381. Generally, when the threatened harm emanates from a human source, an actor who violates the law in response to it can defend only on the grounds of duress, defense of others, or crime prevention. *Id.*[10] The de-

---

**9.** *Nelson v. State*, 597 P.2d 977, 979 (Alaska 1979). *See* E. Arnolds & N. Garland, *The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil*, 65 J.Crim.Law & Criminology 289, 294 (1974); W. LaFave & A. Scott, *Criminal Law* § 50 at 385–88 (1972). *See also* AS 11.81.320, directing the courts to apply the common law to the defense of necessity in most situations.

**10.** LaFave and Scott note that this requirement may be relaxed in some contexts:

With the defense of necessity, the pressure must come from the physical forces of nature (storms, privations) rather than from other human beings. (When the pressure is from human beings, the defense, if applicable, is called duress rather than necessity).

. . . .

The typical duress case, however, has involved a situation in which A has ordered B to engage in certain conduct prohibited by the criminal law or else suffer certain consequences. It might well be argued that when an individual acts to avoid a greater harm from a person who has not given such an order—e. g., see *People v. Richards*, 269 Cal. App.2d 768, 75 Cal.Rptr. 597 (1969), where defendant alleged he escaped from prison to avoid being killed by other inmates—the situation ought to be dealt with as a form of necessity rather than duress. In Richards, the court held the defense of duress was not available because 'there was no offer to show that anyone demanded or requested that the defendant escape.'

W. LaFave & A. Scott, Criminal Law § 50 at 381–82 (1972) (footnote integrated into text). Some jurisdictions have agreed. *See, e. g., People v. Lovercamp*, 43 Cal.App.3d 823, 118 Cal.Rptr. 110 (Cal.App.1974) (under certain circumstances, necessity defense based upon threats of forcible sodomy may be raised in prosecution of prisoner on escape charges). The United States Supreme Court has defined very narrowly the situations in which a necessity defense to an escape charge may be available, *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), holding that defendants must produce evidence of a bona fide attempt to surrender or return to custody as soon as the claimed necessity had lost its coercive force. We do not disagree with this expansion of the necessity defense to encompass human threats, but we are in agreement with those commentators who have noted that it should be limited to cases in which the threatened man-made harm is illegal:

The courts which have held the [necessity] defense inapplicable based their decisions primarily on the holding that first trimester abortions are legal. These opinions imply that whenever the harm emanates from a human source, this harm must be unlawful before the necessity defense can be used. This assumption, although not explicit in the cases or statutes, is solidly based in the common law as developed in both older and more recent cases. The early cases did not face the question as they dealt only with harms caused by natural forces, which can never be illegal. When faced with cases involving human-created harms, the courts modified the necessity doctrine and required that the threatened harm be illegal. This requirement continued in the prison escape cases. Although these decisions held necessity to be a proper plea when the threatened harm emanated from a human source, the facts of the

fense of duress is clearly inappropriate here since appellants do not claim that their illegal acts were compelled by "the unlawful threats of another." E. Arnolds & N. Garland, *The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil*, 65 J.Crim.L. & Criminology 289, 290 (1974). The other two related defenses—defense of others and crime prevention—require that the harm avoided by the charged act be unlawful. R. Perkins, *Criminal Law* 1019 (2d ed. 1969).[11] Abortion, or the "killing of unborn children" as appellants characterize it, is not unlawful in this state, as appellants concede.[12] Given these principles, appellants' argument must fail since the alleged harm sought to be avoided did not arise from a natural source and was not unlawful.

Second, we find the reasoning of the Hawaii Supreme Court in *State v. Marley*, 509 P.2d 1095 (Hawaii 1973), persuasive. In *Marley*, the defendants were convicted of criminal trespass after entering the offices of Honeywell Corporation in an attempt to stop the "war crimes" being committed by Honeywell. As in the present case, the *Marley* defendants' behavior was nonviolent but was disruptive of normal business operations. *Id.* at 1099. Their necessity defense was rejected for three reasons, two of

which we find applicable here: first, "[w]here there is a third alternative available to defendants that does not involve violation of the law, defendants are not justified in violating the law. Other forms of non-criminal protest were and are available to defendants to enable them to dramatize, and hence hopefully terminate, conduct which they may view [as] harmful." *Marley*, 509 P.2d at 1109 (citations omitted). Second, defendants are "unentitled to the defense of 'necessity' because their actions were not reasonably designed to actually prevent the threatened greater harm .... Under any possible set of hypotheses, defendants could foresee that their actions would fail to halt" the practices to which they objected. *Id.*

Appellants seek to distinguish *Marley* on the ground that the alleged harm in that case—the manufacture of weapons to be used in the Vietnam war—was spacially and temporally remote from the site of the trespass whereas the abortions they prevented were scheduled in the very rooms appellants occupied and blocked, within minutes of the time of their entry. However, the lack of "imminence" in *Marley* was only one of the three grounds relied upon by the court, and the differences between this case and *Marley* do not render

cases involved human-created threats of unlawful acts, usually rape, homicide or felonious assault. Recent codifications and judicial opinions discuss the necessity defense in broad terms, neither expressly designating the source of the threatened harm nor its character. They are meant to codify the common law and can fairly be assumed to embody common-law principles. Several states' inclusions of self-defense and defense of another, which both justify otherwise unlawful conduct in the face of another person's unlawful act, support this thesis.

Note, *Necessity as a Defense to a Change of Criminal Trespass in an Abortion Clinic*, 48 U.Cin.L.Rev. 501, 513 (1979).

11. Prof. Perkins explains that the "defense of others" doctrine was originally limited to others within the defendant's family or household, or some other group as to whom he had a legal or socially recognized duty of protection. The common-law privilege of using force for crime prevention was not limited in terms of those to whose aid the defendant could come, but was limited to crimes involving felonious attacks.

Both have been expanded beyond these original limitations. "The present position, which represents a merging of the privilege of crime prevention with the privilege of defending others, is that one may go to the defense of a stranger if that person is the innocent victim of an unlawful attack." R. Perkins, Criminal Law 1019 (2d ed. 1969).

The new criminal code requires, for both self-defense and defense of others, that the defendant be responding to "what he reasonably believes to be the use of unlawful force." AS 11.81.330(a); 11.81.340.

Thus, even assuming that a fetus should be regarded as an "other" in the context of a "defense of others" claim, the requirement that the threatened harm be illegal precludes such a claim here.

12. Appellants do argue, however, that abortion is violative of international law. Similar arguments were raised and rejected in *Marley*. *State v. Marley*, 509 P.2d 1095, 1109–12 (Hawaii 1973).

the other two grounds less applicable. In other respects, the facts of the two cases are closely analogous. In both cases, it was obvious to the trespassers that their actions could not halt the alleged greater harm to which society had given its imprimatur, but rather that, at best, the harm could be only postponed for a brief interval, following which society's normal operations would reassert themselves. This was simply not the kind of emergency situation contemplated by the defense of necessity.

Further, in spite of appellants' protestations to the contrary, their acts, like the acts of the *Marley* defendants, are much more appropriately characterized as protesting with the intent to "dramatize, and hence hopefully terminate, conduct which they may view [as] harmful," *id.* at 1109, then, as appellants describe their own behavior, "directly intervening to avert an imminent threat to human life." Appellants' protest was, in fact, part of a nationwide protest that resulted in several similar arrests in other cities. Appellants appear to concede that if their actions are best described as a protest, the necessity defense would be unavailable. We think it manifest that it would be inappropriate to characterize these trespasses as anything other than a protest, and that appellants' argument of necessity must therefore be rejected.

Third, the defense of necessity requires a showing that the harm sought to be avoided was greater than the harm reasonably foreseeable as resulting from a defendant's illegal actions. *Nelson v. State,* 597 P.2d 977, 980 (Alaska 1979). That is, the harm reasonably foreseeably resulting from a failure to act must be balanced against that fore-seeably resulting from the illegal action. We believe that harm to both the Clinic and its patients was reasonably foreseeable to the trespassers. The Clinic's schedule was disrupted and its operating room required resterilization; and it was certainly foreseeable that the patients scheduled to undergo abortions at the time the demonstration occurred would suffer emotional distress as a result of appellants' invasion of their privacy during a particularly sensitive period.

Against this must be weighed the foreseeable results of appellants' failure to intervene—the routine performance of abortions, or, as appellants regard it, the killing of human life. Appellants acknowledge that the Supreme Court of the United States has expressly rejected the identification of fetuses as "persons" in this context. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 728–730, 156–59, 35 L.Ed.2d 147, 179–80, *reh. denied,* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973). Appellants' view is that *Roe v. Wade,* although foreclosing the possibility of action by state officials to protect fetuses until viability, does not prohibit similar actions by individuals. The question, then, is a familiar one: whether appellants can, by appeal to a "higher law," justify their illegal attack on a form of government-approved behavior. Citing this court to two unreported cases [13] and the Nuremberg Trials,[14] appellants seek a ruling that, as a general principle, abortion is a more significant evil than trespass.

However, even assuming that appellants are correct in arguing that *Roe v. Wade* does not control as to the weight to be accorded "potential life" in this context,[15] the United States Supreme Court is not the only authority to which we must defer in

13. *See* note 8 *supra.*

14. *United States of America v. Greifelt,* 4 Trials of War Criminals Before the Nuernberg Military Tribunal 608 (1949).

15. However, we are not certain that the distinction is a plausible one. By carving out a necessity defense in abortion protest cases, *i. e.,* judicially sanctioning private attempts to deprive pregnant women of rights the Supreme Court has declared them to have as against the state, this court itself might trigger the "state action" requirement of the Fourteenth Amend-

ment. *See Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). If the legislature cannot delegate a "veto power" to the patient's parent or spouse, *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), we think it unlikely that a state court could delegate such a "veto power" to strangers, to be exercised in such an obtrusive manner.

We note that, in *Northern Virginia Women's Medical Center v. Balch,* 617 F.2d 1045 (4th Cir. 1980), the court upheld a district court injunction and contempt order under 42 U.S.C. § 1985

this area. The Alaska legislature is better suited to strike the balance than is this court. Indeed, the law of necessity itself requires us to consult the legislature's enactments:

> The defense of necessity is available only in situations wherein the legislature has to itself, in its criminal statute, made a determination of values. If it has done so, its decision governs.

LaFave and Scott, *supra,* § 50 at 382.[16]

■ Alaska's legislature has, we think, already spoken as to the balancing before us, and concluded that the interests in potential life appellants sought to vindicate are outweighed by the very privacy interests appellants sought to invade.[17] Thus, we cannot agree that any abortions that were delayed by appellants' demonstration can be characterized as sufficiently harmful to outweigh the harm that was the foreseeable result of appellants' behavior.

We hold that the trial court's rejection of appellants' necessity defense was proper.[18] We are in agreement with the District of Columbia Court of Appeals' response to the

---

against Mr. Gaetano and other demonstrators who, under the protection of the Fairfax County rulings noted above in n. 8, were systematically blocking access to the abortion clinic without being prosecuted. The complaint charged these demonstrators, with the complicity of the state court judges and prosecutors (who had temporarily suspended prosecutions in such trespass cases), with denying the abortion clinic and its patients the right to perform and obtain abortions in conformity with the Federal Constitution.

**16.** The new criminal code contains a similar limitation at AS 11.81.320:

> *Justification: Necessity.* Conduct which would otherwise be an offense is justified by reason of necessity to the extent permitted by common law when
>
> (1) neither this title nor any other statute defining the offense provides exemption or defenses dealing with the justification of necessity in the specific situation involved; and
>
> (2) a legislative intent to exclude the justification of necessity does not otherwise plainly appear.

**17.** AS 18.16.010 reads:

> *Abortions.* (a) No abortion may be performed in this state unless (1) the abortion is performed by a physician or surgeon licensed by the State Medical Board under AS 08.64.-200; (2) the abortion is performed in a hospital or other facility approved for the purpose by the Department of Health and Welfare or a hospital operated by the federal government or an agency of the federal government; (3) consent has been received from the parent or guardian of an unmarried woman less than 18 years of age; and (4) the woman is domiciled or physically present in the state for 30 days before the abortion. 'Abortion' in this section means an operation or procedure to terminate the pregnancy of a nonviable fetus. Nothing in this section requires a hospital or person to participate in an abortion, nor is a hospital or person liable for refusing to participate in an abortion under this section.

> (b) A person who knowingly violates a provision of (a) of this section, upon conviction, is punishable by a fine of not more than $1,000, or by imprisonment for not more than five years, or by both.

We express no opinion as to the constitutionality of these provisions. We only cite the statute to note that the legislature has resolved the "choice of evils" questions appellants would have us decide.

**18.** A recent law review article cites several policy considerations that lead to the same conclusion:

> When a court justifies an illegal act, it creates a new rule of law to govern the same dilemma in the future. In the clinic trespass context, this would mean that all sincere anti-abortion protesters who invaded clinics to prevent abortions would not be subject to criminal liability. There is even authority that clinic personnel or other persons could not use force to stop these justified actions. This could effectively close all abortion clinics so that women would have no means by which to effectuate their decision. This would occur even though clinic action causes no legal harm. There has never been an application of the necessity defense having such profound effects. The prison escape cases do not provide an adequate parallel since courts treat each case as unique, requiring a specific threat to the particular defendant. In the clinic cases a mere showing that abortions were being performed would be enough to acquit the anti-abortion intruder. Necessity was never meant to be applied in such an abusive manner.
>
> The doctrine was developed to deal with unusual circumstances—ones never contemplated by the criminal or civil law. Abortions are not rare occurrences. They are sanctioned by the Constitution and by a substantial portion of society. This is not an area in which the law is silent. When a court applies necessity, its balancing of the harms reflects society's consensus. Necessity is

necessity defense raised by participants in a similar anti-abortion demonstration:

> Unlike medical necessity or other emergency situations, the necessity cited by appellants cannot shield them from criminal liability for their acts.
>
> The rights to free speech, to assembly, and to petition the government for grievances are a cornerstone of the American system. So, too, is the right to be free from criminal interference. These appellants trespassed on the rights of others and did so without excuse.

*Gaetano v. United States,* 406 A.2d 1291, 1295 (D.C.App.1979).

## III.

### JURY INSTRUCTIONS.

Appellants assert that the following three instructions were so "confusing and contradictory" as to require reversal:

### [NO. 7]

In the crime charged in the complaint, there must exist a union or joint operation of act or conduct and criminal intent. To constitute criminal intent it is not necessary that there should exist an intent to violate the law.

### [NO. 8]

In this case, if you find from the evidence that a defendant honestly believed that he or she had a right to remain on the premises occupied by Alaska Hospital and Clinic even after being instructed to leave, and that such belief was based upon reasonable grounds, and that the conduct of each defendant would have been lawful and proper had the facts been such as defendant honestly believed

them to be, then you must find such defendant not guilty.

### [NO. 9]

To constitute the defense of necessity, the defendants would have had to show that they were attempting to prevent some harm that was within their presence. Since the facts of this case have shown that the defendants were not attempting to prevent harm within their presence, the defense of necessity is not applicable. Therefore, you may not consider the defense of necessity in your deliberations.

On appeal, the superior court agreed that the instructions were inconsistent, but held that the inconsistency did not require reversal. In its written opinion, the superior court stated:

> The real problem is that instruction no. 8 states a proposition of law that is inapplicable to these cases. In essence, instruction no. 8 is an instruction on mistake of law as a defense. Mistake of law is not a defense applicable to the municipal trespass ordinance (AO 8.30.010) under which appellants were charged. Consequently, the judge gave an unwarranted instruction. The fact that instructions nos. 7 and 9 were inconsistent with no. 8 simply served to cure the error of giving no. 8. The error was harmless, as it is clear that the jury rejected the erroneous mistake of law instruction, so that 'the jury was not substantially swayed or affected by the error.' *Adkins v. Lester,* 530 P.2d 11, *reh. den.,* 532 P.2d 1027 (Alaska 1974).

Instruction number eight was based upon the trial court's view that, although appellants could not defend on the basis of necessity, they could seek to excuse their conduct

meant to justify action that society would clearly want to exonerate. Trespasses that interfere with constitutional rights do not fall within this purpose.

Allowing necessity to justify these protests permits defendants to choose which laws they will obey based on their own moral code. This would justify acts of civil disobedience. The fact that these protests are the only means available at the moment to stop

the abortion does not change the major purpose of the action which protesters and their lawyers admit is to change the law with regard to abortion. This simply cannot be accepted as a proper use of the necessity defense. [footnotes omitted]

Note, *Necessity as a Defense to a Charge of Criminal Trespass in an Abortion Clinic,* 48 U.Cin.L.Rev. 501, 514–15 (1979).

on the ground that they honestly and reasonably believed that that defense justified their presence at the Clinic. Three of the four appellants testified that they were aware of two judicial decisions in which, on facts virtually identical to those in the present case, defendants were acquitted on the ground of necessity.[19] All four testified that they believed they had a legal right to enter the Clinic in an attempt to prevent abortions from being performed. The instruction, then, would have required acquittal had the jury found these beliefs to be both honest and reasonable.

At trial, the state argued that the mistake of law defense, as presented by appellants, is only applicable if the mistaken reliance is upon the statutory, administrative, or case law of either the United States or the state in which the illegal actions were committed. We have found no authority, and appellants cite none, for the proposition that an individual is justified in relying on the case law of other jurisdictions in deciding on a course of conduct.

■ Since the cases relied upon by appellants were both decided by a trial court in Fairfax County, Virginia, the defense of "reliance of a judicial decision" is inapplicable to the present case. The district court therefore committed error in giving instruction number eight.

■ We must agree with appellants' claim that the three instructions taken together were confusing. Instruction seven explains, correctly, that the criminal intent necessary to convict does not include intent to violate the law. Instruction eight, however, indicates that if the appellants honestly and reasonably believed their actions did not violate the law, they were not guilty. Instruction nine states the court's correct finding that the necessity defense was not available. Instructions eight and nine, taken together, express the court's erroneous view that an honest and reasonable belief in the availability of that defense could excuse the appellants' violations. Instruction seven, on the other hand, indicates that appel-

lants need not have intended that their conduct be illegal to be convicted even if he thinks his conduct is legal and that he cannot be convicted. The instructions seem to say both that a defendant can be convicted if he reasonably and honestly believes his conduct to be legal.

As the superior court pointed out, instruction eight described a defense that was unavailable to appellants in this case. That instruction could have only operated in appellants' favor, however, and we agree with the superior court's conclusion that "it is clear that the jury rejected the erroneous . . . instruction." We also agree with the superior court's further conclusion that "the jury was not substantially swayed or affected by the error"; as such, it did not affect appellants' substantial rights and was therefore harmless under *Love v. State*, 457 P.2d 622, 631 (Alaska 1969).

Having discerned only the single harmless error discussed above, we perceive no merit in appellants' final claim—that the cumulative effect of the errors alleged to have been committed by the trial court deprived them of the "level of procedural fairness" required by the due process clauses of the United States and Alaska Constitutions. The convictions of appellants are AFFIRMED.

DIMOND, Senior Justice, concurs.

COMPTON, J., not participating.

DIMOND, Senior Justice, concurring.

I agree with the majority that the defendants' convictions must be affirmed. It seems possible to me that under certain circumstances the defense of necessity should justify what would otherwise be illegal conduct engaged in to prevent the performance of an abortion. The defense is clearly inapplicable in this case, however, because as the majority notes the defendants' conduct can only be characterized as a general protest against abortions.

The defense of necessity is designed to justify otherwise illegal conduct taken to

19. See note 8 *supra*.

prevent a *specific* harm from occurring. *See, e. g.*, W. LaFave & A. Scott, Criminal Law § 50 (1972). Public policy prohibits applying the defense of necessity to exonerate a person of liability for his or her legal conduct engaged in as a form of civil disobedience, no matter how laudable the person's goals may be. Thus, the defense of necessity has been ruled unavailable in other prosecutions for trespass at abortion clinics (*Gaetano v. United States*, 406 A.2d 1291, 1294 (D.C.App.1979); *Minnesota v. Rasmussen*, 47 U.S.L.W. 2331 (Minn.Mun. 1978)) and in prosecutions for trespass and vandalism protesting the Vietnam War (*United States v. Berrigan*, 283 F.Supp. 336, 338–40 (D.Md.1968); *State v. Marley*, 509 P.2d 1095 (Hawaii 1973)). The court in *United States v. Berrigan* aptly expressed this rationale:

> No civilized nation can endure where a citizen can select what law he would obey because of his moral or religious belief. It matters not how worthy his motives may be. It is axiomatic that chaos would exist if an individual were permitted to impose his beliefs upon others and invoke justification in a court to excuse his transgression of a duly-enacted law.

283 F.Supp. at 339. A person who chooses to disobey a law because he or she believes it is necessary to do so in pursuit of a moral cause must accept responsibility for the illegality of that conduct. This was particularly well stated by Judge Sobeloff in *United States v. Moylan*, 417 F.2d 1002, 1008 (4th Cir. 1969):

> From the earliest times when man chose to guide his relations with fellow men by allegiance to the rule of law rather than force, he has been faced with the problem how best to deal with the individual in society who through moral conviction concluded that a law with which he was confronted was unjust and therefore must not be followed. Faced with the stark reality of injustice, men of sensitive conscience and great intellect have sometimes found only one morally justified path, and that path led them

inevitably into conflict with established authority and its laws. Among philosophers and religionists throughout the ages there has been an incessant stream of discussion as to when, if at all, civil disobedience, whether by passive refusal to obey a law or by its active breach, is morally justified. However, they have been in general agreement that while in restricted circumstances a morally motivated act contrary to law may be ethically justified, the action must be non-violent and the actor must accept the penalty for his action. In other words, it is commonly conceded that the exercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law.

> Adherents and practitioners of civil disobedience who have reached this conclusion are too many to list. One need only allude to Socrates, Sir Thomas More, Henry David Thoreau, Ghandi, and Martin Luther King, Jr. whose actions supported this proposition. The Lutheran and Episcopal Churches in America have endorsed civil disobedience, but only if action is non-violent and the actor is willing to accept the consequences of his action.

*Id.* at 1008 & n. 21 (footnote integrated into text) (footnote omitted).

I empathize with the defendants' sorrow over the loss of human lives caused by abortions. I believe the United States Supreme Court burdened this country with a tragic decision when it held in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that the word "person," as used in the fourteenth amendment, does not include the unborn, *id.* at 158, 93 S.Ct. at 729, 35 L.Ed.2d at 180, and that states cannot "override the rights of the pregnant woman" by "adopting one theory of life." *Id.* at 162, 93 S.Ct. at 731, 35 L.Ed.2d at 182. I do not agree with the Court's conclusion that a state's interest in potential life does not become "compelling" until the fetus has

attained viability. It stated its explanation for this conclusion as follows:

> With respect to the State's important and legitimate interest in potential life, the "compelling" point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the womb. State regulation protective of fetal life after viability thus has both logical and biological justifications.

410 U.S. at 163, 93 S.Ct. 731–32, 35 L.Ed.2d at 183. As Professor Tribe indicates, "One reads the Court's explanation several times before becoming convinced that nothing has inadvertently been omitted." Tribe, Forward to *The Supreme Court 1972 Term*, 87 Harv.L.Rev. 1, 4 (1973) (footnote omitted). I agree with Professor Tribe when he states, "Clearly, this [analysis] mistakes 'a definition for a syllogism,' and offers no reason at all for what the Court has held." *Id., quoting* Ely, *The Wages of Crying Wolf: A Comment on Roe v. Wade*, 82 Yale L.J. 920, 924 (1973) (footnotes omitted).

In effect, the Supreme Court held that because there is no consensus as to when human life begins it must act as though it were proven that human life does not begin until birth so as to preserve to women the right to make their own decision whether an abortion takes a human life or not. It would make more sense to me if, in the face of uncertainty, any error made were made in favor of the fetus, which many believe to be human life.

The development of a zygote into a human child is a continual, progressive development. No one suggests that the born child is not a human being. It seems undeniable, however, that human life begins before birth. As Professor Curran states:

> [T]he fetus one day before birth and the child one day after birth are not that significantly or qualitatively different in any respect. Even outside the womb the newborn child is not independent but remains greatly dependent on the mother and others. Birth in fact does not really tell much about the individual as such but

only where the individual is—either outside the womb or still inside the womb.

C. Curran, Transition and Tradition in Moral Theology 209 (1979). Similarly, viability does not mark the beginning of the truly human being.

> [V]iability again indicates more about where the fetus can live than what it is. The fetus immediately before viability is not that qualitatively different from the viable fetus. In addition viability is a very inexact criterion because it is intimately connected with medical and scientific advances. In the future it might very well be possible for the fetus to live in an artificial womb or even with an artificial placenta from a very early stage in fetal development.

*Id.* (footnote omitted). I join with those persons who believe that truly human life begins sometime between the second and third week after conception.

> Biological information heavily influences this judgment, but the ultimate reason rests on the recognition that individuality, which is a most fundamental characteristic of the truly human being, is not achieved before this time, up to which twinning and recombination can occur. Before this time there is no organizer which directs the differentiation of the pluripotential cells, and without this organizer hominization cannot occur. Also this theory contends that the large number (perhaps as many as 50 percent) of fertilized ova which are spontaneously aborted without the mother being aware of having conceived are not truly human beings.

*Id.* at 212.

I therefore believe that abortions performed after the second or third week of pregnancy cause the taking of a human life, which should be prohibited under most circumstances. Furthermore, I believe that if a majority of people within a state reach the conclusion that a human life entitled to protection exists some time before birth the people should be able, through their legislature, to enact statutes in accordance with

their "theory of life," as the Court phrased it in *Roe v. Wade*, 410 U.S. at 162, 93 S.Ct. at 731, 35 L.Ed.2d at 182. Nonetheless, persons who share these convictions must work through the political process to achieve their goals or accept the consequences imposed by our legal system for attempting to achieve their goals by unlawful action.[1]

1. I would not categorically reject the argument that the defense of necessity may be invoked to justify conduct intended to prevent a particular abortion form being performed, as opposed to conduct intended to protest abortions in general. For example, if a husband were to trespass at a clinic to prevent his wife from obtaining an abortion after the third week of her pregnancy, I believe the harm he would be seeking to prevent would be greater than the harm he would cause. If there were no other adequate means by which he could prevent the abortion, I think the defense of necessity could justify his conduct.

The majority has suggested several reasons why, under even these circumstances, the defense would be unavailable (*e. g.*, the defense is unavailable if the harm being sought to be prevented emanates from lawful human conduct). However, it seems inappropriate to give these issues extensive consideration, inasmuch as it would not affect the outcome of this case. I believe it is preferable to address these issues when and if a case that involves this particular factual situation comes before this court.