NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| CLINTON R. STRONG and TUIE STRONG, <br><br> Appellants, <br><br> v. <br><br> STATE OF ALASKA, <br><br> Appellee. | Court of Appeals Nos. A-13269 & A-13270 <br> Trial Court Nos. 3NA-17-00029 CR & <br> 3NA-17-00028 CR <br><br> O P I N I O N <br><br> No. 2723 — April 1, 2022 |

Appeal from the District Court, Third Judicial District, Naknek, Christina L. Reigh, Judge.

Appearances: Charles M. Merriner, Law Office of Charles M. Merriner, Anchorage, for the Appellants. Ronald Dupuis, Assistant Attorney General, Office of Special Prosecutions, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge WOLLENBERG.

Clinton and Tuie Strong were convicted of a fishing violation for taking salmon in closed waters after Alaska Wildlife Troopers marked their gillnet outside the western boundary line of the Ugashik fishing district in Bristol Bay.[1]

At their minor offense trial, the couple admitted to taking salmon in closed waters but asserted the affirmative defense of necessity, claiming that they had drifted into closed waters while attempting to repair a leak in the hydraulic system of their fishing boat. The trial court, sitting as fact-finder, acknowledged the difficult situation facing the Strongs but nonetheless rejected the necessity defense on the merits.

On appeal, the Strongs argue, *inter alia*, that the court committed certain legal errors in evaluating their necessity defense. For the reasons explained in this opinion, we agree. We also conclude that, given these legal errors, it is appropriate to remand this case to the district court for reconsideration of the Strongs' defense.

*Underlying facts and proceedings*

In 2017, Clinton Strong and Tuie Strong were permit holders for the drift net salmon season in the Ugashik fishing district in Bristol Bay. Clinton Strong was the skipper of the vessel, the *F/V Entropy*, and they ran the vessel as husband and wife.

On June 25, 2017, Alaska Wildlife Troopers patrolling the Ugashik fishing district by helicopter observed the gillnet of a vessel — later identified as the *Entropy* —

---

[1]   *See* 5 Alaska Administrative Code (AAC) 06.350(f) (providing that "[s]almon may not be taken in any locations" other than those authorized by regulation); *see also* AS 16.05.722(a) (providing that a person who, without any culpable mental state, violates a commercial fishing regulation is guilty of a violation); 5 AAC 39.002 ("Unless otherwise provided . . . a person who violates a provision of 5 AAC 01 - 5 AAC 41 is strictly liable for the offense, regardless of his intent.").

approximately 272 feet into closed waters.[2]  The troopers marked the gillnet's location in their GPS during an initial flyby.  When they returned a few minutes later to take pictures, the *Entropy* was back in legal waters.

About a week later, a trooper served Clinton and Tuie Strong with a misdemeanor citation for fishing in closed waters.  (The citation was later reduced to a strict-liability minor offense.[3])

The Strongs explained to the trooper that their boat had drifted into closed waters while they were addressing a mechanical failure onboard.  They offered the same explanation at their minor offense bench trial.

Clinton Strong testified that he, Tuie, and a third crew member were fishing in legal waters about three-tenths of a mile inside the western boundary of the district when the *Entropy*'s hydraulic system failed.  The main feeder line for the controls came out of its fitting, and hydraulic fluid began leaking onto the deck of the boat.[4]  Fearing the contamination of the dozens of fish on deck and the 2,000 to 3,000 pounds of fish in the holds, Clinton Strong immediately cut the engine (which directly powered the hydraulic system), moved the fish on deck away from the leak, and began repairs.  The other crew members helped to move the fish and tried to contain the leaking fluid.

---

[2]  The Ugashik district is demarcated by regulations of the Board of Fisheries, 5 AAC 06.200(d).

[3]  Violations of Board of Fisheries regulations are generally strict liability minor offenses, although the State may prosecute them as misdemeanors under certain circumstances.  *See Beran v. State*, 705 P.2d 1280, 1285-86, 1291 n.13 (Alaska App. 1985) ("[E]very fish and game regulation comprises both a crime requiring *mens rea* and a violation which differs from the crime only in that a conviction does not require a finding of *mens rea*.").

[4]  Clinton Strong testified that he inspects his boat for needed repairs every spring, and that he had no prior indication that the line was bad.

Clinton estimated that, when the system failed, the *Entropy* had about 500 feet of gillnet in the water, containing several hundred fish. A combination of an ebb tide and winds from the east caused the *Entropy* to drift toward the western boundary of the district. Clinton spent about fifteen minutes repairing the hydraulic line, and was just completing repairs when the crew saw a helicopter fly overhead. Clinton returned to the bridge of the *Entropy*, saw that the vessel had drifted into closed waters, and immediately piloted the boat back into legal fishing waters. Clinton estimated that he had only been in closed waters for one or two minutes and took maybe four or five fish during that time.

At trial, the Strongs acknowledged that they had been fishing in closed waters. But they raised the defense of necessity, arguing that cutting the engine — which resulted in the boat drifting into closed waters — was the only way to avoid contaminating their catch and fish holds with hydraulic fluid.

Clinton estimated that, if he had not cut the engine power, about fifty-two gallons of hydraulic fluid would have spilled within less than ten minutes. He testified that the fluid would likely have gotten into the fish holds where most of the catch was stored, although he did not know whether the fluid would have drained into the ocean. Clinton stated that, if the fish holds were contaminated, the hydraulic fluid would have ruined the several thousand pounds of salmon stored there, and cleaning such a spill would have taken considerable time and expense. He further noted that it would have been impossible to haul in his net without using the hydraulic system, and that, if he had dropped the anchor, it likely would have snapped the line or failed to hold given the conditions, the depth of the water, and the number of fish still in their net.

Tuie Strong, who had been a crew member on the *Entropy* for the previous eight seasons, affirmed Clinton's version of events and testified that they had no alternative to cutting the engine. Two other witnesses, including the Strongs' other crew

member and another fisherman who had been on the radio with Clinton at the time, provided corroborating testimony.

The State did not contest that the Strongs had suffered a hydraulic leak. The State also conceded that the Strongs were entitled to consideration of their necessity defense.[5] But the State argued that the Strongs had a number of alternatives to cutting their engine: dropping anchor, manually "round-hauling" their net, or sailing into an open area. According to the State, because the Strongs never tried to do any of those things, they had not proven the defense. The State stressed that trying to avoid "a few dollars in lost fish" did not give the Strongs the right to break the law.

The trial court rejected the Strongs' necessity defense and found the Strongs guilty of the closed-water violation, although the court acknowledged that the Strongs had no reasonable alternative and were placed in a "tough situation." At sentencing, the court continued to recognize that the Strongs found themselves in a "pretty unique and difficult situation," facing "something that was very much out of their control." The court fined the Strongs $500 each.[6]

---

[5] To merit consideration of the defense of necessity, a defendant must first present "some evidence" on each of the elements of the defense. *State v. Garrison*, 171 P.3d 91, 94 (Alaska 2007). Initially, the State contested the applicability of the necessity defense to a strict liability offense, but ultimately conceded that the defense applied in this case. *See Clucas v. State*, 815 P.2d 384, 388-90 (Alaska App. 1991) (holding that a defendant is entitled to assert a justification defense to a strict liability fishing violation because such a defense does not implicate the culpable mental state of an offense); *see also Lawler v. State*, 1998 WL 894944, at *1-2 (Alaska App. Dec. 23, 1998) (unpublished) (noting that defendants can raise "defenses . . . unrelated to culpable mental state" in strict liability proceedings and evaluating whether defendant proved necessity defense by preponderance of evidence in strict liability commercial fishing violation case (citing *Clucas*, 815 P.2d at 388-90)).

[6] The Strongs were also subject to the assessment of demerit points against their fishing permits by the Commercial Fisheries Entry Commission. *See* AS 16.43.850(b)(1);

(continued...)

*A closer look at the defense of necessity and the trial court's ruling*

Criminal defendants in Alaska may assert an affirmative defense of necessity to the extent permitted by common law, except when the defense is preempted or otherwise specifically delineated by the legislature.[7] To prove the defense of necessity, a defendant must show by a preponderance of the evidence that: (1) the defendant committed the charged offense to prevent a significant evil; (2) there was no adequate alternative to the charged offense; and (3) the harm caused was not disproportionate to the harm avoided by breaking the law.[8] When, as here, the offense is a continuing one, a defendant must also show that they stopped breaking the law as soon as the necessity ended.[9]

In considering the first, second, and fourth elements, the defendant's conduct is evaluated based on the defendant's reasonable beliefs at the time of acting.[10] Thus, the defense is available to someone whose apprehension of harm was reasonable but mistaken, but not to someone who seeks to justify a criminal act after the fact by reference to harms they did not perceive at the time they acted or harms their criminal conduct was not actually calculated to avoid.[11]

---

[6]   (...continued)
20 AAC 05.1971(a).

[7]   AS 11.81.320.

[8]   *See* AS 11.81.900(b)(2)(B) (providing that a defendant has the burden of proving an affirmative defense by a preponderance of the evidence); *Garrison*, 171 P.3d at 94 (explaining the elements of the necessity defense).

[9]   *Garrison*, 171 P.3d at 94.

[10]   *Id.*

[11]   *Compare Allen v. State*, 123 P.3d 1106, 1108-09 (Alaska App. 2005) (holding that
(continued...)

The trial court issued a written order explaining its verdict and its reason for rejecting the Strongs' necessity defense. The court expressly found that the Strongs did not intend to go into illegal waters and were "distracted because of an urgent mechanical issue." According to the court, Clinton Strong shut off the engine to "avoid spilling excessive amounts of hydraulic fluid," and the boat drifted into closed waters while the crew was trying to fix the leak.

The court rejected the State's arguments that throwing the anchor or round-hauling the net were reasonable alternatives under the conditions and found that the Strongs had proved the second element of necessity — *i.e.*, that they had no adequate alternative to shutting off the engine in order to repair the hydraulic leak. The court acknowledged:

> The defendants were placed in a tough situation. . . . The conditions at the time of the leak — the amount of wind, the direction of the tide, the depth of the water, the amount of net and fish in the water, and the strength of the three-person crew — left the defendants with no other alternative than to turn off their engine and fix their hose. It was reasonable for the defendants to believe that throwing their anchor in those conditions would be unsafe and potentially lead to a more

---

[11] (...continued) defendant charged with driving with a suspended license was entitled to an instruction on necessity defense because he presented some evidence that he reasonably, if mistakenly, believed that his mother needed speedy medical attention and there was no alternative to driving), *with Muller v. State*, 196 P.3d 815, 818 (Alaska App. 2008) (holding that defendant charged with criminal trespass was not entitled to raise defense of necessity because he offered no evidence that he reasonably believed his actions could prevent a significant evil or that he reasonably believed he had no adequate alternative to trespassing); *see also* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.1(d)(3), at 168 (3d ed. 2018) ("To have the defense of necessity, the defendant must have acted with the intention of avoiding the greater harm. Actual necessity, without the intention, is not enough. . . . An honest (and, doubtless, reasonable) belief in the necessity . . . is all that is required[.]").

dangerous situation. Likewise, round hauling 400-500 feet of net with fish in 15-20 knot winds with only three people ranging from 40 to 70 years old would have been nearly impossible . . . [or] taken a lot longer than fixing the hose and they may have been even farther into closed waters.

The court also found that the Strongs had proved the fourth element of the necessity defense — *i.e.*, that they stopped violating the law as soon as the necessity ended:

The defendant [Clinton Strong] credibly testified that as the trooper's helicopter was flying over his vessel, he was finishing up fixing the hose. Within five minutes of that fly-by, the vessel was back into legal waters. The evidence supported a finding that as soon as the defendants could power their engine, they quickly entered into legal waters, thus ending the harm as soon as possible.

However, the court found that the Strongs had not proved the first and third prongs of the necessity defense. As to the first prong — whether the Strongs acted to prevent a significant evil — the court determined, as a factual matter, that the Strongs had not acted out of concern for the environment or their own safety but primarily to prevent the contamination of their catch and gear and to avoid the resulting economic consequences. The court further concluded, as a legal matter, that these potential financial harms were not a "significant evil" that triggered the necessity defense.[12]

---

[12] The court initially ruled that the Strongs did not meet the first element of the defense as a matter of law because they never made a conscious decision to fish in closed waters, and thus never formed any reasonable belief that fishing in closed waters was necessary to prevent harm. Upon reconsideration, however, the court ruled that knowledge of closed-water fishing was not required — *i.e.*, the risk that the boat might drift into closed waters with its net extended was sufficient — but that the Strongs had still failed to establish the first prong of the necessity defense because "potential economic impact . . . does not rise to the level of a 'significant evil.'"

As to the third prong — whether the harm caused by breaking the law was disproportionate to the harm avoided — the court reasoned that even if the economic harm the Strongs sought to avoid constituted a significant evil, that harm did not outweigh the risk of damage to the state's resources resulting from fishing in closed waters. The court acknowledged that "hydraulic fluid would have been a disaster for the defendants to clean up and would have prevented them from delivering several thousand pounds of fish," but that this harm did not outweigh the "possible disruption of the balance of escapement and harvest of the state's salmon."[13]

The court therefore concluded that the harm caused was disproportionate to the harm the Strongs sought to avoid.

*Why we conclude that the Strongs satisfied the first prong of the necessity defense as a matter of law*

The Strongs appeal two separate aspects of the trial court's ruling on the first element of the necessity defense: (1) the trial court's factual finding that the Strongs were not acting to prevent environmental harm; and (2) the trial court's legal conclusion that destruction of property and/or salmon does not constitute a "significant evil."

As we already noted, the trial court found that the Strongs were concerned about the potential damage from the hydraulic fluid to their catch and to their fishing equipment, but not contemporaneously concerned about the possibility of polluting the ocean. The court found that any concern for environmental harms was simply a *post hoc* justification rather than a motivating factor in the Strongs' decision to cut the engine.

---

[13] "Escapement" refers to "the annual estimated size of the spawning salmon stock; quality of the escapement may be determined not only by numbers of spawners, but also by factors such as sex ratio, age composition, temporal entry into the system, and spatial distribution within the salmon spawning habitat." 5 AAC 39.222(f)(10).

This is a factual finding that is entitled to deference. Having reviewed the record, we conclude that the court's finding is supported by the record and is not clearly erroneous.[14]

However, we agree with the Strongs that the trial court erred in concluding, as a matter of law, that the potential damage to property and destruction of salmon resulting from the hydraulic spill did not constitute a "significant evil" for purposes of the first prong of the necessity defense. In reaching this conclusion, the trial court drew on cases holding that the risk of physical harm and threats to personal safety can constitute significant evils. But these cases do not foreclose the risk of harm to property from being considered a significant evil. Neither this Court nor the Alaska Supreme Court has ever ruled that the necessity defense applies exclusively to situations involving physical harm.

Indeed, both the Alaska Supreme Court and this Court have considered the necessity defense in cases involving the risk of property damage or financial loss without dismissing the defense as legally unavailable.[15] For instance, the supreme court in *Greenwood v. State* considered whether a defendant, who believed that her former boyfriend was about to attack her and burn down his parents' nearby home, was entitled

---

[14] *See Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 392 (Alaska 2017) (noting that in a bench trial, the judge is the trier of fact, and factual findings are reviewed for clear error).

[15] *See, e.g.*, *Pasco v. State, Dep't of Admin., Div. of Motor Vehicles*, 45 P.3d 325, 326-28 (Alaska 2002) (considering whether substantial evidence supported administrative officer's decision to reject driver's defense that he operated vehicle while intoxicated to ameliorate the risk of his home burning down); *Nelson v. State*, 597 P.2d 977, 979-80 (Alaska 1979) (evaluating adequacy of necessity instruction in case where defendant was accused of joyriding in highway vehicle to recover truck from marsh); *see also Schnabel v. State*, 663 P.2d 960, 965-66 (Alaska App. 1983) (concluding that defendant was not entitled to necessity instruction because he failed to submit "some evidence" that he had no alternative to moving heavy equipment across a salmon stream to prevent significant economic damage).

to an instruction on necessity for driving under the influence.[16] In considering the first element, the court acknowledged the risk of several harms, separately noting both the potential physical harms to the defendant and others *and* the potential property damage resulting from arson.[17] And at least two scholarly treatises refer to property damage as a qualifying harm for purposes of triggering the necessity defense.[18]

Moreover, under the Alaska Constitution, "[t]he legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people," and "[w]herever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use."[19] Under AS 16.05.831, even a reckless "failure to utilize the majority of the [salmon] carcass" is a sufficiently significant evil to warrant a penalty of up to 6 months imprisonment and a $10,000 fine, or to subject a violator to "a civil action

---

[16]  *Greenwood v. State*, 237 P.3d 1018, 1020 (Alaska 2010).

[17]  *Id.* at 1023.

[18]  2 Wayne R. LaFave, *Substantive Criminal Law* § 10.1(d)(1), at 166 (3d ed. 2018) (recognizing that "[t]he harm avoided need not be physical harm (death or bodily injury)"; it "may . . . be harm to property"); 2 Paul H. Robinson, *Criminal Law Defenses* § 124(g)(3), at 62-63 (1984) (current through July 2021 supplement) (observing that, although some states limit the necessity defense to cases involving threats of personal injury, that approach is not the universal view and it does not accord with the policy rationale behind the defense; "[s]ince the proportionality requirement demands that the harm resisted must always be greater than that actually caused, there can be no danger in leaving the triggering conditions open to seemingly minor threats").

[19]  Alaska Const., art. VIII, §§ 2-3; *see also O'Callaghan v. Rue*, 996 P.2d 88, 99 (Alaska 2000) (noting that "salmon remain subject to the common use clause while in the natural waters of the state").

by the state for the cost of replacing the salmon wasted."[20]  The fact that the legislature has expressly prohibited the wasting of salmon demonstrates the value of this resource. Its unnecessary destruction is a harm not only to the financial interests of individuals but to the whole state of Alaska.

The court acknowledged that, had the Strongs allowed the fluid to continue leaking, it would potentially have contaminated their catch, substantially damaged important equipment on the boat, and rendered the hydraulic system inoperable, leaving no way for the Strongs to haul in the several hundred feet of net that was still in the water and the fish inside.  Given these factual findings, we conclude that the Strongs acted to avert a "significant evil" and therefore established the first prong of the necessity defense as a matter of law.[21]

---

[20]  At trial, the parties disputed whether the Strongs could be held liable for salmon waste if they allowed their catch to become contaminated.  Ultimately, the trial court found that the Strongs lacked the required mental state to be guilty of violating this statute because they did not recklessly cause the hydraulic fluid to start leaking.  *See* AS 16.05.831; 5 AAC 93.310(c) (exempting from liability "contamination . . . not the result of intentional, knowing, or reckless actions").  We question the trial court's resolution of this issue — liability under the statute could presumably hinge on whether the Strongs were reckless in *responding* to the leak, not only in *causing* it.  But we do not decide this issue.  We note the existence of the salmon waste penalties only to emphasize the legislature's determination that waste of salmon is a harm to the state as a whole.  We owe deference to the legislature's value judgment on this point.  *Cf. Cleveland v. Anchorage*, 631 P.2d 1073, 1079-81 (Alaska 1981) (holding that necessity defense cannot be based on avoidance of "harm" expressly legalized by legislature).

[21]  Because we conclude that the waste of salmon and the economic harms the Strongs sought to avoid constitute a significant evil for purposes of the necessity defense, we need not address the Strongs' argument that the first prong of the necessity defense would be "void for vagueness" if it did not encompass these harms.

*Whether the Strongs established the third prong as a matter of law*

The trial court also concluded that the Strongs failed to demonstrate the third prong of the necessity defense — that "the harm caused was not disproportionate to the harm avoided by breaking the law."[22] This prong requires an objective balancing of the harms the Strongs sought to avoid against the harm reasonably foreseeable from the Strongs' illegal conduct, viewed in light of the facts perceived by them.[23] The Strongs argue that the trial court applied the wrong legal analysis and erred in concluding that the balance of harms weighed against them.

As we previously noted, the harms that the Strongs sought to avoid — the contamination of thousands of pounds of salmon, substantial damage to the *Entropy*'s equipment, and the resulting financial consequences — implicated both their own interests and the interests of the state of Alaska. The remaining prong of the proportionality inquiry required the trial court to weigh these harms against the harms reasonably foreseeable from the Strongs' conduct.[24]

The evidence established that the Strongs shut off their engine in order to repair their hydraulic line, and that they intended to restart the engine only once the hydraulic line was repaired. The foreseeable result of turning off the engine under the conditions that day was drifting toward the seaward boundary of the district, potentially into closed waters, and continuing to "fish" until the repair was complete because it was

---

[22]   *State v. Garrison*, 171 P.3d 91, 94 (Alaska 2007).

[23]   *Id.* at 95-97; *Greenwood v. State*, 237 P.3d 1018, 1026-27 (Alaska 2010); *see also* LaFave, *Substantive Criminal Law* § 10.1(d)(2), at 167 ("[I]n cases where there is a difference between the harm which [a defendant's] conduct actually causes and the harm which was necessarily to be expected from his conduct . . . it is the harm-reasonably-expected, rather than the harm-actually-caused, which governs.").

[24]   *See Greenwood*, 237 P.3d at 1026-27.

not otherwise possible to haul in the net.[25]  As the trial court acknowledged, the proper inquiry is not how many fish the Strongs actually took while in closed waters, but how many fish one could reasonably foresee might be taken during that time and the consequent disruption of this taking on salmon escapement.

In many cases, the harms that could foreseeably result from the violation of a statute are intuitive and may not require any particular evidence or argument to elucidate.  For example, a driver who violates traffic laws by driving directly into oncoming traffic poses a clear risk to the safety of other drivers, and a fact-finder can easily comprehend those foreseeable risks based on their everyday experience without any particularized evidence in the record.

The foreseeable harms resulting from *this* violation of the closed-water regulation are far less intuitive, however.  The trial court concluded that the Department of Fish and Game enacts closed water regulations for a variety of reasons, including to ensure a proper balance of escapement and harvesting of Alaska's salmon resources. The court also expressed concern that if "fishermen with mechanical problems who accidentally drift into closed water were exempted from following the boundary rules, those rules would quickly erode."

We acknowledge that the balance of escapement and harvest of Alaska's salmon resources are important values, explicitly protected in the state constitution, and the trial court properly inquired into the impact the Strongs' conduct had upon that balance.  But the key question in this prong of the necessity defense is not what *general* harms the statutory scheme was created to avoid.  If this were the test, then the necessity

---

[25]  *See* 5 AAC 06.350(f) (prohibiting the "tak[ing]" of salmon in closed waters); AS 16.05.940(35) (defining "take," for purposes of the fish and game code, as "taking, pursuing, [or] fishing, . . . or attempting to take, pursue, . . . fish, . . . or in any manner capture or kill fish").

defense would never apply to a fish and game violation, since the overall preservation of the resource would always outweigh the harm to the resource caused by the violation.

Instead, the proper inquiry is whether the Strongs' particular violation of the closed-water statute would meaningfully impact these ecological goals under the circumstances of their case.[26] That is, the trial court should have determined the reasonably foreseeable harms that would result from the Strongs' conduct — the number of fish they would potentially take during the period of time they would foreseeably be in closed waters, and the ecological impact of those takings — and compared that risk of harm to the waste of 3,000 pounds of salmon, the damage to the *Entropy*, and the substantial economic losses that would have resulted from an unabated leak. We agree with the Strongs that the trial court did not properly apply this analysis.

Having established legal error, the Strongs ask this Court to apply this analysis in the first instance and resolve the proportionality prong of the necessity defense in their favor.[27] The Strongs point to their uncontroverted testimony that they gained no advantage by crossing the seaward boundary of the district during the ebb tide and emphasize that the State did not dispute their estimate that they took only four or five

---

[26] *See Greenwood*, 237 P.3d at 1026-27 (emphasizing that the balancing of harms requires "an objective comparison of the relative seriousness of the harms caused and avoided" from the perspective of the defendant, and considering the particular circumstances of the defendant's drunk driving — that it had occurred on a back road, at low speed, and for a little less than a mile).

[27] The State contends that the Alaska Supreme Court's opinion in *Greenwood v. State* establishes that proportionality is a question of fact and argues that we should review the trial court's proportionality finding in this case under the clearly erroneous standard. *Id.* Relying on this Court's opinion in *Allen v. State*, the Strongs argue that the proportionality element is a question of law that must be reviewed by this Court *de novo*. *Allen v. State*, 123 P.3d 1106, 1108 (Alaska App. 2005). Given that we are remanding this case for further proceedings in the trial court, we need not resolve this issue.

fish during the one or two minutes that they spent in closed waters.[28]

But we decline to undertake this analysis in the first instance. Because the trial court did not apply the proper analysis, it did not make the necessary findings of fact relevant to the proportionality determination: the harms reasonably foreseeable from the Strongs' closed-water violation. We believe that the trial court is in the best position to make these factual findings and to then resolve the question of proportionality, taking into account our conclusion that the harms the Strongs sought to avoid qualified as a "significant evil."

We therefore remand this case for reconsideration of the harms reasonably foreseeable from the Strongs' conduct and determination of whether the Strongs proved their necessity defense based on the evidence presented at trial.[29]

*Conclusion*

The judgments of the district court are VACATED. We REMAND these cases for further proceedings consistent with this opinion. We retain jurisdiction.[30]

---

[28] We note that the State offered no evidence about the specific harms of harvesting salmon in that location or the particular ecological or commercial justifications for the location of the seaward boundary in the Ugashik fishing district. *Cf. Demmert v. State*, 2021 WL 3754590, at *2 (Alaska App. Aug. 25, 2021) (unpublished) (discussing testimony of Alaska Department of Fish and Game area management biologist about the ecological impact of commercial fishing offenses).

[29] *See Colgan v. State*, 711 P.2d 533, 536 (Alaska App. 1985) ("Because Colgan received a non-jury trial, however, we do not believe that a reversal and retrial are called for. Rather, application of the correct standard can be accomplished by simply remanding this case to the superior court for reconsideration of the verdicts of conviction.").

[30] Given our resolution of this appeal, we need not address the Strongs' remaining claims at this time.