The STATE of North Dakota,
Plaintiff and Appellee,

v.

Russell Harry SAHR, Marlene Ann Sahr, Mark Timothy Noah, Brian John Schmisek, Nick M. Breidenbach, Matthew John Noah, Dennis W. Uchtman, Charlene Renee Uchtman, Gail Ranae Brensike, Nyrie Joy Breidenbach, and Ida Lorene Breidenbach, Defendants,

and

Kathryn Ann Beneda, Defendant and Appellant.

CITY OF JAMESTOWN, Plaintiff and Appellee,

v.

Dennis W. UCHTMAN, Defendant and Appellant (Two Cases).

STATE of North Dakota, Plaintiff and Appellee,

v.

Russell Harry SAHR, Marlene Ann Sahr, Mark Timothy Noah, Brian John Schmisek, and Charlene Renee Uchtman, Defendants and Appellants,

and

Nick M. Breidenbach, Matthew John Noah, Dennis W. Uchtman, Gail Ranae Brensike, Kathryn Ann Beneda, Nyrie Joy Breidenbach and Ida Lorene Breidenbach, Defendants.

STATE of North Dakota, Plaintiff and Appellee,

v.

Russell Harry SAHR, Marlene Ann Sahr, Mark Timothy Noah, Brian John Schmisek, Nick M. Breidenbach, Matthew John Noah, Charlene Renee Uchtman, Gail Ranae Brensike, Kathryn Ann Beneda, Nyrie Joy Breidenbach, and Ida Lorene Breidenbach, Defendants,

and

Dennis W. Uchtman, Defendant and Appellant.

Cr. Nos. 900098, 900165, 900166, 900173 and 900174.

Supreme Court of North Dakota.

May 7, 1991.

Joseph F. Larson, II (argued), Asst. City Atty., Jamestown, for plaintiff and appellee, City of Jamestown.

Monty Grant Mertz (argued), Fargo, for defendants and appellants.

MESCHKE, Justice.

Russell Harry Sahr, Marlene Ann Sahr, Mark Timothy Noah, Brian John Schmisek, Charlene Uchtman, Kathryn Ann Beneda, and Dennis W. Uchtman appeal from convictions of criminal trespass for protest activities at abortion clinics in Jamestown and Fargo. The defendants contend that they should have been allowed to present evidence on the defense of necessity to justify their conduct. We affirm.

Dennis W. Uchtman was charged with two violations of the ordinances of the City of Jamestown by trespassing on November 8, 1988, and December 12, 1988, in front of Dr. Robert E. Lucy's clinic on the 2nd floor at the Jamestown Mall. After transfer to Stutsman County Court for jury trial, Uchtman moved to be allowed to present evidence "bearing on the justification defense of necessity or commonly known as 'choice of evils'." Uchtman's supporting affidavit summarized his beliefs:

3. I believe that life begins at conception. I had a reasonable basis to believe and personal knowledge that abortions were to be performed on these dates [November 8 and December 12, 1988] at that location [Dr. Robert Lucy's clinic on the 2nd floor of the Jamestown Mall]. I reasonably, and in good faith, believe that my actions in entering on the private property of another were necessary to prevent a greater harm, that being the destruction of innocent human lives.

The Honorable Mikal Simonson, Stutsman County Judge, limited the admission of evidence: "The Court will allow the general testimony as to [his] beliefs and why [he] acted as [he] did. However, the Courtroom will not become a legislative hearing room on the pros and cons of abortion."

At his jury trial on April 6, 1990, Uchtman testified that he was "pro-life" and believed that "abortion is murder, and that we need to do what we can to stop murder, to stop the holocaust." However, the trial court granted the prosecutor's motion to strike Uchtman's testimony when he refused to submit to cross-examination. The jury found Uchtman guilty of the criminal trespasses. The trial court sentenced Uchtman to two concurrent 10–day jail sentences, suspended for one year of informal probation on condition that he pay a fine of $100 and costs of $50.

Russell Harry Sahr, Marlene Ann Sahr, Mark Timothy Noah, Brian John Schmisek, Charlene Uchtman, Kathryn Ann Beneda, and Dennis W. Uchtman were each charged with criminal trespass in violation of NDCC 12.1–22–03 for blocking the entries to the Women's Health Organization in Fargo. Kathryn Beneda had a trial without a jury before the Honorable Frank L. Racek, Cass County Judge. Judge Racek found her guilty of criminal trespass, ordered her to serve 30 days in jail with 29 days suspended for one year of supervised probation, and assessed costs of $35. One condition of Beneda's probation directed that she is "not to be within one block of the Women's Health Organization" during probation.

Dennis W. Uchtman had a jury trial before the Honorable Georgia Dawson, Cass County Judge. The jury found Uchtman guilty of criminal trespass. The court fined Uchtman $35, deferred imposition of sentence for one year, and placed him on

probation. One condition of Uchtman's probation directed that he "is not to be on the premises of the Women's Health Organization or be within 1 block thereof for the next 1 year period."

The other defendants in Fargo moved in limine that they "be allowed to present evidence in their defense bearing on the justification defense of necessity or 'choice of evils'." To support their defense, they asked

to present evidence which would include, but not be limited to:

a. The medical and scientific fact that life begins at conception.

b. Medical testimony concerning the beginning of life from conception on and the development of an unborn human child.

c. The mechanics and physiology of a suction abortion.

d. The film "The Silent Scream" which depicts through sonogram the events occurring in a suction abortion.

e. As demonstrative evidence the medically preserved bodies of unborn human children.

f. The Defendants' individual testimony concerning their knowledge and understanding that abortions were to occur on the premises they are alleged to have trespassed on, on or about December 29, 1989, and that their actions were necessary to prevent loss of human life.

Judge Dawson denied the motion. After they filed a written offer of the evidence that they would have presented, these defendants were tried without a jury on a stipulation of facts. Judge Dawson found each of them guilty of criminal trespass, imposed on each a fine of $35, and deferred imposition of each sentence for one year of unsupervised probation. As a condition of probation, each defendant was directed "not to present himself [or herself] within 1 block of the Women's Health Organization" during probation.

The appeals in these cases were consolidated to submit three questions: (1) Was Dennis W. Uchtman denied a speedy trial? (2) Should defendants be allowed to present evidence of necessity to justify their conduct? (3) Could the defendants be restricted from access to the abortion clinic during probation?

## 1. SPEEDY TRIAL

■ Dennis W. Uchtman contends that the Stutsman County Court erred in denying his motion to dismiss for violation of his right to a speedy trial. Resolving such a claim requires an evaluation of four factors: length of delay, reasons for delay, the defendant's assertion of his right to a speedy trial, and prejudice to the defendant. *State v. Connery*, 441 N.W.2d 651 (N.D.1989); *State v. Runck*, 418 N.W.2d 262 (N.D.1987). Although "[a] defendant may waive the right to speedy trial by failing to demand a prompt trial," *State v. Littlewind*, 417 N.W.2d 361, 364 (N.D. 1987), no single factor is controlling.

Uchtman was arrested on November 8, 1988, and again on December 12, 1988. He was tried on April 6, 1990. The delay between the arrest and the trial was substantial. At the March 2, 1990, pretrial conference when Uchtman's motion to dismiss was considered, no reasons for the delay were given, other than the prosecutor's statement that "the City doesn't schedule trials."

Arguably, Uchtman asserted his right to a speedy trial in two letters to Judge Harold B. Herseth, Stutsman County Judge, on November 21, 1989, and December 14, 1989, after Uchtman learned that a pretrial conference had been scheduled for January 4, 1990. In both letters Uchtman asked about arranging an earlier trial: "So is there a way that my speedy and public trial could be arranged before this?" (November 21, 1989); "So at this point we need to know what is required of us to bring about our speedy and public trial provided for us by our Constitution." (December 14, 1989). Shortly after these letters, on January 5, 1990, Uchtman demanded a change of judge. Judge Simonson was assigned on January 17, 1990. On January 23, 1990, Judge Simonson scheduled a pretrial conference for March 2, 1990, and trial for April 6, 1990. On February 21, 1990, Uchtman moved to dismiss for delay in trial.

The motion was denied, and Uchtman was tried on April 6, 1990.

The assigned judge held the trial with reasonable promptness. Uchtman has not shown how the preceding delay prejudiced his defense. The absence of prejudice substantially weakens his speedy trial claim. *Runck*, 418 N.W.2d at 267. After considering the relevant factors, we are not persuaded that Uchtman was denied his right to a speedy trial.

## 2. NECESSITY DEFENSES

■ The defendants argue that the trial courts erred in preventing them from presenting evidence for their justification defenses of necessity, or, as they choose to describe them, their "choice of evils" defenses. In doing so, the defendants develop six underlying premises:

[1]. [They] have constitutional rights to present a defense under the Fourteenth Amendment to the United States Constitution.

[2]. The Non-personhood of the Unborn under Roe v. Wade Does Not Preclude ... the Necessity Defense.

[3]. The Application of the Necessity Defense has Usually Been to Circumstances in which the Evil Prevented, Like Abortion, is Not Unlawful.

[4]. Roe v. Wade and [following] Opinions do not Prohibit Private Individuals from Non–Violently Attempting to Prevent Loss of Life From Abortions.

[5]. North Dakota has Recognized that Justification can be a Defense in Chapter 12.1–05 of the N.D.C.C.

[6]. The "Choice of Evils" or Necessity Defense Should Apply to Defendants' Actions in this Case.

We conclude that these premises, separately or together, do not justify criminal trespass to interfere with legal abortions.

It is true, as the defendants advance in their fifth premise, that North Dakota recognizes that justification can be a defense in a criminal prosecution. NDCC Ch. 12.1–05. Chapter 12.1–05 "is an almost complete adoption of Ch. 6 of the Proposed [New Federal Criminal] Code dealing with defenses involving justification and ex-cuse." *State v. Leidholm*, 334 N.W.2d 811, 814 (N.D.1983). *See Final Report of the National Commission on Reform of Federal Criminal Laws* (1971). *Leidholm* explained justification and excuse:

A defense of justification is the product of society's determination that the *actual existence* of certain circumstances will operate to make proper and legal what otherwise would be criminal conduct. A defense of excuse, contrarily, does not make legal and proper conduct which ordinarily would result in criminal liability; instead, it openly recognizes the criminality of the conduct but excuses it because the actor believed that circumstances actually existed which would justify his conduct when in fact they did not. In short, had the facts been as he supposed them to be, the actor's conduct would have been justified rather than excused.

334 N.W.2d at 814–15. The broad notion of necessity, however, is not one of the particular justifications authorized in NDCC Ch. 12.1–05 and has not yet been recognized by this court.

Yet, in their sixth premise, defendants argue that the necessity defense is available here. "The defense of necessity has its roots deep in the common law." *State v. O'Brien*, 784 S.W.2d 187, 189 (Mo.App. 1989). As Blackstone said of self-defense, one variation of necessity:

Both the life and limbs of a man are of such high value, in the estimation of the law of England, that it pardons even homicide if committed *se defendendo* (in self-defense), or in order to preserve them. For whatever is done by a man, to save either life or member, is looked upon as done upon the highest necessity and compulsion.

I Blackstone, *Commentaries* *130. *See also* IV Blackstone, *Commentaries* *28 ("... it is highly just and equitable that a man should be excused for those acts which are done through unavoidable force and compulsion."). "That certain kinds of public necessity will excuse what would otherwise be a breach of the law, has long been a recognized principle." VIII W.

Holdsworth, *A History of English Law* 445 (2nd Impression 1973). During the medieval period, criminal liability came to be based upon a *mens rea. Id.* at 433. The defenses of coercion, compulsion, and necessity "rest ultimately on the fact that, in the circumstances, no *mens rea* is imputable." *Id.* at 443. "The modern equivalent of the common-law defense of necessity is the so-called 'choice of evils' or 'competing harms' doctrine." 1 *Wharton's Criminal Law* § 88 at 413 (14th ed. 1978). Some kinds of necessity—for example, self-defense—have become well established as justification for conduct that would otherwise be criminal, but there is less agreement on recognizing other kinds of necessity as defenses.[1]

General statements of the necessity defense have been formulated in a number of ways, usually by statute. For illustrations, *see* New York Penal Law § 35.05;[2] Model Penal Code § 3.02;[3] 2 P. Robinson, *Criminal Law Defenses* § 124 (1984).[4] With his

1. Necessity is an affirmative defense. *State v. O'Brien;* Model Penal Code § 3.01. "The burden of production for the defense of lesser evils (choice of evils, necessity) is always on the defendant." 2 P. Robinson, *Criminal Law Defenses* § 124(b) at 47 (1984). When the necessity defense applies, it justifies an accused's criminal conduct so that the accused is not guilty of the crime charged, or so that the seriousness of the accused's offense is reduced.

2. New York Penal Law § 35.05 frames a generalized necessity defense in this way:

Unless otherwise limited by the ensuing provisions of this article defining justifiable use of physical force, conduct which would otherwise constitute an offense is justifiable and not criminal when:

\*    \*    \*    \*    \*    \*

2. Such conduct is necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor, and which is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding such injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue. The necessity and justifiability of such conduct may not rest upon considerations pertaining only to the morality and advisability of the statute, either in its general application or with respect to its application to a particular class of cases arising thereunder. Whenever evidence relating to the defense of justification under this subdivision is offered by the defendant, the court shall rule as a matter of law whether the claimed facts and circumstances would, if established, constitute a defense.

3. Section 3.02 of the Model Penal Code is another formulation of the necessity defense:

Justification Generally: Choice of Evils.

(1) Conduct that the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:

(a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and

(b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

(2) When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for his conduct, the justification afforded by this Section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

The Comment to this formulation illustrates conduct justified by necessity:

Under this section, property may be destroyed to prevent the spread of a fire. A speed limit may be violated in pursuing a suspected criminal. An ambulance may pass a traffic light. Mountain climbers lost in a storm may take refuge in a house or may appropriate provisions. Cargo may be jettisoned or an embargo violated to preserve the vessel. An alien may violate a curfew in order to reach an air raid shelter. A druggist may dispense a drug without the requisite prescription to alleviate grave distress in an emergency. A developed legal system must have better ways of dealing with such problems than to refer only to the letter of particular prohibitions, framed without reference to cases of this kind.

4. In his treatise on criminal law defenses, Professor Robinson formulates a general necessity defense another way:

The lesser evils defense, sometimes called "choice of evils" or "necessity" or the general justification defense, is recognized in about one-half of American jurisdictions. It is perhaps the best illustration of the structure and operation of justification defenses generally. It explicitly relies upon the rationale inherent in all justifications: while the defendant may have caused the harm or evil contemplated by an offense, given the justifying circumstances, he has not caused a net harm or evil and is therefore to be exculpated. The principle of this general justification defense may be stated as follows:

formulation, Professor Robinson opines that only legally recognized interests justify responsive criminal conduct.

> The phrase "legally protected interest" ... is to be interpreted broadly to include all interests that the community is willing to recognize and that are not specifically denied recognition by the legal system.[4]

---

4. Surprisingly, no statute explicitly excludes from triggering conditions threats to interests specifically rejected by law. But there can be little doubt that if the situation arose, courts would refuse to recognize the justified use of force in protection of legally repudiated interests on the ground of presumed legislative intent, but it would seem preferable to make clear from the outset that only threats to legally-recognized interests can trigger a justified response.

2 P. Robinson, *Criminal Law Defenses*, § 124(b), p. 47. While the other formulations are not as clear as Professor Robinson's on this point, each formulation posits some limits to the kind of evil, harm, or injury that will justify criminal conduct to avoid.

The *Study Draft of a New Federal Criminal Code* (1970) was the forerunner of the draft criminal code from which our North Dakota criminal code was drawn. The Study Draft proposed another formulation of the necessity defense:

> § 608. Conduct Which Avoids Greater Harm.
>
> Conduct is justified if it is necessary and appropriate to avoid harm clearly greater than the harm which might result from such conduct and the situation developed through no fault of the actor. The necessity and justifiability of such conduct may not rest upon considerations pertaining only to the morality and advisability of the penal statute defining the offense, either in its general application or with respect to its application to a

particular class of cases arising thereunder.

The Comment to proposed § 608 said: "This section affirms the proposition that a man is not to be punished as a criminal if his prohibited conduct averted more harm than it caused. This is sometimes called the 'choice of evils' rule." The Comment also said: "Proposed section 608 embodies the legal doctrine of 'necessity.' It makes no sense to punish persons who have acted to avoid great harm, even if they have 'broken a law' to do so." I *Working Papers of the National Commission on Reform of Federal Criminal Laws* 270 (1970). The National Commission eventually recommended a narrower codification of justifications and excuses without an explicit necessity-defense formulation.

The National Commission explained why in its Comment to § 601 (Justification):

> This partial codification is not an attempt to freeze the rules as they now exist. It may therefore be desirable to be explicit that the statutory definition of these rules is not intended to preclude the judicial development of other justifications. For example, the so-called "choice of evils" rule, *i.e.*, that emergency measures to avoid greater injury may be justified, has not been included in this Chapter on the view that, while its intended application would be extremely rare in cases actually prosecuted, even the best of statutory formulations (see N.Y.Pen.L. § 35.10) is a potential source of unwarranted difficulty in ordinary cases, particularly in the context of the adoption of the broad mistake of fact and law provisions found in the Code. Codification, as opposed to case-by-case prosecutive discretion, is regarded as premature. On the other hand, some Commissioners believe that a penal code is seriously deficient if it does not explicitly recognize that avoidance of greater harm is, if not a duty, at least a privilege of the citizen.

> Lesser Evils. *Conduct constituting an offense is justified if:*
> *(1) any legally-protected interest is unjustifiably threatened, or an opportunity to further such an interest is presented; and*
> *(2) the actor engages in conduct, constituting the offense,*

> *(a) when and to the extent necessary to protect or further the interest,*
> *(b) that avoids a harm or evil or furthers a legal interest greater than the harm or evil caused by actor's conduct.*
> 2 P. Robinson, *Criminal Law Defenses* § 124(a), pp. 45–46 (1984).

*Final Report of the National Commission On Reform of Federal Criminal Laws* at 43 (1971). Our Legislature adopted, "almost complete[ly]," the National Commission's chapter on justifications and excuses in enacting our criminal code in 1973. *Leidholm,* 334 N.W.2d at 814. Thus, while the history of the legislative development of justification defenses in our state shows that NDCC Ch. 12.1–05 "is not intended to preclude the judicial development of other justifications," it is clear that our criminal code does not license the judicial extension of justification to any individualized conception of "necessity."

As a result, we conclude that we need not determine the precise scope of the necessity defense available in this state. In our view, the defendants' criminal trespasses at medical clinics to prevent legal abortions may not be justified under any reasonable formulation of the necessity defense.

■ The evil, harm, or injury sought to be avoided, or the interest sought to be promoted, by the commission of a crime must be legally cognizable to be justified as necessity. "[I]n most cases of civil disobedience a lesser evils defense will be barred. This is because as long as the laws or policies being protested have been lawfully adopted, they are conclusive evidence of the community's view on the issue." 2 P. Robinson, *Criminal Law Defenses* § 124(d)(1), at 52. Abortion in the first trimester of pregnancy is not a legally recognized harm, and, therefore, prevention of abortion is not a legally recognized interest to promote.[5]

The Abortion Control Act, NDCC Ch. 14–02.1, authorizes and regulates abortions. "The purpose of this chapter is to protect unborn human life and maternal health within present constitutional limits."

NDCC 14–02.1–01. Those constitutional limits are set by the United States Supreme Court. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), holds that the right of privacy guaranteed by the United States Constitution encompasses a woman's decision whether to terminate a pregnancy, and that the State may not interfere with that decision during the first trimester of pregnancy. *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), holds that the State may not give a woman's spouse or parents, or other third parties, the right to interfere with the woman's decision to have an abortion since the State itself lacks that right. *See also Webster v. Reproductive Health Services,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (Chief Justice Rehnquist, for the plurality, "would modify and narrow *Roe* and succeeding cases." 109 S.Ct. at 3058. Justice Blackmun, writing for three justices, concurring and dissenting, says: "For today, at least, the law of abortion stands undisturbed." 109 S.Ct. at 3079). Thus, prevention of abortion is not a legally recognized interest, and an abortion is not a legally cognizable injury.

■ The element of a legally cognizable injury for the necessity defense has been identified repeatedly in decisions on other criminal attempts to protest abortions at medical clinics. *State v. Clowes,* 310 Or. 686, 801 P.2d 789, 797 (1990) (Because "termination of pregnancies are legal, nontortious activity, . . . their occurrence cannot be a 'public or private injury'" and "defendants are foreclosed from asserting the defense of choice of evils."); *State v. O'Brien,* 784 S.W.2d at 192 ("In short, the defense of necessity asserted here cannot be utilized when the harm sought to be

---

**5.** There may be other reasons, as well, (or, perhaps, other ways of expressing the same reason), why these defendants are not entitled to pursue a necessity defense. *See,* for examples, *Wharton's Criminal Law,* § 88, p. 414 ("In order to prevent this doctrine from being used to justify civil disobedience, a mercy killing, or the personal cause of a crusader, it is commonly provided that the necessity of defendant's conduct 'may not rest upon considerations pertain-

ing only to the morality and advisability of the statute' involved."); 1 LaFave and Scott, *Substantive Criminal Law,* § 5.4(5), p. 638 (1986) ("If, however, there is open to him a third alternative, which will cause less harm than will be caused by violating the law, he is not justified in violating the law."), including footnote 54 citations about existing alternatives of seeking legal resolutions of the situation, rather than the use of criminal conduct.

avoided [abortion] remains a constitutionally protected activity and the harm incurred [trespass] is in violation of the law."); *People v. Crowley*, 142 Misc.2d 663, 538 N.Y. S.2d 146, 149–151 (Just.Ct.1989) ("In this case, the very activity labelled an injury by Defendants and sought to be prevented has been afforded legal protection by the New York Legislature and by the Supreme Court ... [A]t least with regard to criminal cases arising from attempts to disrupt medical procedures that are within the parameters of the law, the necessity defense must fail as a matter of law."); *Cleveland v. Municipality of Anchorage*, 631 P.2d 1073, 1079 (Alaska 1981) ("Abortion ... is not unlawful in this state, as appellants concede. Given these principles, appellants' argument must fail since the alleged harm sought to be avoided did not arise from a natural source and was not unlawful."); *People v. Stiso*, 93 Ill.App.3d 101, 48 Ill.Dec. 687, 689, 416 N.E.2d 1209, 1211 (1981) ("[T]he very activity labelled an injury [abortion] by defendants and sought to be prevented has been afforded legal protection by the United States Supreme Court."); *People v. Krizka*, 92 Ill.App.3d 288, 48 Ill.Dec. 141, 142, 416 N.E.2d 36, 37 (1980) ("Under *Roe*, an abortion during the first trimester of pregnancy is not a legally recognizable injury, and therefore, defendants' trespass was not justified by reason of necessity."). In sum, a claim of necessity cannot be used to justify a crime that simply interferes with another person's right to lawful activity.[6]

We go back to the first three premises advanced by defendants: their constitutional rights to present a defense; "The Non-personhood of the Unborn;" and the occasional application of the necessity defense to prevent a "not unlawful" evil. To be operative, a defense must be legally cognizable. As we have explained, the evil which the defendants use to justify their conduct is a legal abortion, a constitutionally protected act. It does not matter that the necessity defense, as advanced by the defendants, may have been used to justify

conduct where the evil prevented is a "not unlawful" one, a lawful act. It is the lack of a legally cognizable evil, rather than "The Non-personhood of the Unborn under Roe v. Wade," that precludes use of the necessity defense to justify criminal conduct in interfering with abortions. The fact that abortions are legally protected makes the necessity defense unavailable here.

The defendants' fourth premise, that *Roe v. Wade* and similar decisions do not apply to individual efforts to prevent abortion, has been roundly rejected:

> Moreover, defendants' argument that the decision in *Roe* is not applicable here because that case relies on the Fourteenth Amendment, which prohibits actions by the States, not individuals, is without merit. The argument ignores the fact that defendants' convictions did not arise from the violation of the constitutional rights of pregnant women, but rather, were the result of defendants' acts of criminal trespass.

*People v. Krizka*, 48 Ill.Dec. at 142, 416 N.E.2d at 37. We join in that rejection. Also, we agree with the Alaska Supreme Court's reasoning:

> If the legislature cannot delegate a "veto power" to the patient's parent or spouse, *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), we think it unlikely that a state court could delegate such a "veto power" to strangers, to be exercised in such an obtrusive manner.

*Cleveland v. Municipality of Anchorage*, 631 P.2d at 1080 n. 15. It is this interference with other persons' rights to engage in legally protected acts that makes the defendants' criminal trespasses unjustifiable.

The court in *State v. O'Brien*, 784 S.W.2d at 192, pointed out that "every court which has considered the defense of necessity has for various reasons, rejected it when asserted in trespass-abortion pro-

---

6. We express no view on the availability of the necessity defense when a trespasser seeks to prevent the performance of an unlawful abor-

tion. *See People v. Crowley*, 142 Misc.2d 663, 538 N.Y.S.2d 146, 151 n. 3 (Just.Ct.1989).

ceedings." These defendants have not identified any reported appellate opinion in which abortion protesters have been allowed to use the necessity defense to justify a criminal trespass, and we find none. A lawful abortion is not a legally cognizable evil, harm, or injury justifying criminal trespass at a medical clinic. We conclude, as a matter of law, that the necessity defense is not available to these defendants.

### 3. PROBATION CONDITIONS

■ The defendants contend that the trial courts in the Fargo cases abused their discretion in conditioning probation upon a restriction that probationers not go within one block of the Women's Health Organization, an abortion clinic.

A sentencing court may impose conditions on probation. NDCC 12.1–32–07. Subsection 2 of that statute says:

> The conditions of probation must be such as the court in its discretion deems reasonably necessary to ensure that the defendant will lead a law-abiding life or to assist the defendant to do so. The court shall provide as an explicit condition of every probation that the defendant not commit another offense during the period for which the probation remains subject to revocation.

NDCC 12.1–32–07(2). The statutory conditions are not exclusive. *State v. Saavedra*, 406 N.W.2d 667 (N.D.1987); *State v. Perbix*, 331 N.W.2d 14 (N.D.1983). "The only statutory limitation on the imposition of conditions of probation is that such conditions must be 'reasonably necessary to ensure that the defendant will lead a law-abiding life or assist him to do so.'" *Id.* at 18. "[P]robation is not the same as freedom." *Id.* at 18. Probationers "properly are subject to limitations from which ordinary persons are free." *United States v. Consuelo–Gonzalez*, 521 F.2d 259, 265 (9th Cir.1975). "'The court has a responsibility to regulate a probationer's activities to help in his rehabilitation and at the same time to guard against continued criminal behavior.'" *State v. Perbix*, 331 N.W.2d at 18, quoting *State v. Schlosser*, 202 N.W.2d 136, 139 (N.D.1972). A sentencing court

has broad discretion in setting the conditions of probation.

Distance restrictions have been upheld in other protest cases. *See, e.g., United States v. Lowe*, 654 F.2d 562 (9th Cir.1981); *State v. Friberg*, 421 N.W.2d 376 (Minn. App.1988). In *Lowe*, the court upheld a probation condition prohibiting Trident-weapons-system protesters from coming within 250 feet of a naval submarine base:

> Given the alternatives of imprisonment or some other greater restriction upon appellants' movements, speech, and association, the 250–foot limit is reasonable. It is not so great as to prevent all protest activity; yet it allows law enforcement officials a buffer zone in which to detect probation violations and discourage repeat offenses before would-be trespassers are upon the fence.

654 F.2d at 568. In *Friberg*, the court upheld a probation condition prohibiting defendants convicted of trespass charges from coming within 500 feet of the Planned Parenthood Clinic in St. Paul, Minnesota:

> The imposition of a 500–foot prohibition from the clinic's premises is reasonable, enforceable and is not so great as to prevent all protest activity. Though the restriction prohibits probationers from approaching within 500 feet of this clinic, the limitation does not prevent probationers from protesting at any other clinics or attending meetings or distributing leaflets. The restriction is reasonably related to the prior offense and tailored to deter future protests by these appellants at this clinic.... Given the alternatives of imprisonment or some other greater restriction upon appellants' movements, speech, and association, the 500–foot limitation is reasonable.

421 N.W.2d at 380. A specific restriction designed to inhibit another crime during protest demonstrations is clearly reasonable.

Prohibiting these probationers from coming within one block of the Women's Health Organization for one year as a condition of probation is well-suited to assisting them to lead a law-abiding life during that time. The condition does not prohibit

all protest activity. "[T]he enduring clashes of beliefs in this fractious dispute" need not take place entirely in "physical confrontations at the front line." *People v. Crowley*, 538 N.Y.S.2d at 152. These probationers can still attend meetings, distribute leaflets, or demonstrate elsewhere.[7]

In this light, considering the alternative of incarceration, we conclude that the imposition of a probation condition restricting the probationers' access to the Women's Health Organization is reasonable and does not unduly restrain probationers' liberty. *See Friberg*, 421 N.W.2d at 380. We conclude that the trial courts did not abuse their discretion in so conditioning the probation of these defendants.

## 4. CONCLUSION

The City of Jamestown moved for attorney fees under NDRAppP 38, contending that Dennis W. Uchtman's appeals from the judgments of conviction in Stutsman County are frivolous. The motion is denied.

The judgments of conviction and the sentences are affirmed.

ERICKSTAD, C.J., and LEVINE and GIERKE, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I concur in the result reached by the majority opinion. I write separately to express certain concerns which arise therefrom.

The delay in Dennis Uchtman's trial, from November/December, 1988 to April 1990, on a charge of violating city ordinances, is inordinately long. The fact there were a number of persons tried for similar offenses should not compromise his right to a speedy trial. I agree with the majority opinion that after Uchtman demanded a change of judge on January 5, 1990, the newly assigned judge held the trial with due dispatch. But that does not explain or excuse the delay that occurred prior to the time of the demand. Presumably, the only legitimate reason for concluding that Uchtman was not denied his right to a speedy trial is that the time between the demand for a speedy trial, November 21, 1989, and the actual time of the trial, on April 6, 1990, was not excessive when, during that period of time, Uchtman demanded a change of judge. Because the demand for a prompt trial was not made earlier, I reluctantly concur that Uchtman's right to a speedy trial was not unconstitutionally denied. *State v. Wunderlich*, 338 N.W.2d 658 (N.D.1983).

I also write to mark the distinction between the right to protest, protected by the First Amendment to the United States Constitution, *e.g.*, *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *City of Bismarck v. Schoppert*, 469 N.W.2d 808 (N.D.1991), and a violation of the law in exercising that right. Nevertheless it would be naive to believe that protests of activities "afforded legal protection" such as the Viet Nam conflict, nuclear power, etc., traditionally recognized as exercises of the First Amendment, did not occasionally violate some statute or ordinance in those protests. Many of the decisions of the United States Supreme Court upholding the First Amendment right to protest involved a charge that some criminal statute or ordinance had been violated. *E.g.*, *Texas v. Johnson*, *supra*, and cases cited therein.

---

**7.** The United States Supreme Court recently agreed to review an injunction against abortion protestors who "intentionally trespass" at clinics for the purpose of blocking access to medical services for abortions. The district court enjoined the protestors from "trespassing on, blockading, impeding or obstructing access to or egress from" listed clinics, but refused on First Amendment grounds to enjoin other activities that tend to "intimidate, harass or disturb patients or potential plaintiffs." *National Organization for Women v. Operation Rescue*, 726 F.Supp. 1483, 1497 (E.D.Va.1989). The Court of Appeals affirmed, holding that the activities of the protestors "in furtherance of their beliefs had crossed the line from persuasion into coercion and operated to deny the exercise of rights protected by law." *N.O.W. v. Operation Rescue*, 914 F.2d 582, 585 (4th Cir.1990). On February 25, 1991, the United States Supreme Court granted certiorari, sub nom. *Bray v. Alexandria Women's Health Clinic*, —— U.S. ——, 111 S.Ct. 1070, 112 L.Ed.2d 1176 (1991).

It has been through such protests that otherwise "legal" activities have been shown to be contrary to constitutional principles. For example, until *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was decided, *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), legalized statutes and ordinances providing for "separate but equal" schools, public accommodations, etc., for the different races. For those of us old enough to remember, *Brown* was accompanied by several years of public demonstrations, and, most probably, convictions of the protesters of trespass. Traditionally, defendants who have been charged with violating statutes and ordinances have, at the least, been permitted to demonstrate in court their belief in the illegality of the statute or ordinance which they have been charged with violating. That is a protected and respected method of challenging an illegal and unjust precept of the law. Here, however, we are one step removed from those situations. The defendants have not been convicted of violating a statute which they allege to be unconstitutional. Rather, in their attempt to prohibit actions which they believe to be evil, they have been convicted of violating ordinances prohibiting trespass.

I do not necessarily agree that the defendants could not have been acquitted on a "necessity" defense. To conclude, as does the majority, that the evil, harm or injury sought to be avoided "must be legally cognizable to be justified as necessity" and "because as long as the laws or policies being protested have been lawfully adopted, they are conclusive evidence of the community's view on the issue" accords more infallibility to government edicts than even I am willing to do. I would not so restrict the "judicial development of other justifications" in this State. It is the right of the citizens, whether they be a minority or a majority, to object to the "community's view" on an issue and our history is replete with instances in which such protests have served either directly or as a catalyst to reform the "community view."

The defendants were entitled to explain to the court why they violated the law prohibiting trespass. Although there is confusion in the records as to what occurred at the various proceedings involved in these several cases, it appears that for the most part the defendants were able to do so, albeit not to the extent they desired. There is little doubt that the fact-finders knew and understood the reason for the action of the defendants.

I understand the majority opinion concerning the "necessity" defense to be narrow in its application. *State v. Leidholm*, 334 N.W.2d 811 (N.D.1983), was concerned with self-defense (*see* NDCC § 12.1–05–03), and defense of justification and excuse under chapter 12.1, NDCC. We discussed the defense of excuse generally and observed: "A defense of excuse ... does not make legal and proper conduct which ordinarily would result in criminal liability; instead, it openly recognizes the criminality of the conduct but excuses it because the actor believed that circumstances actually existed which would justify his conduct when in fact they did not." *State v. Leidholm*, 334 N.W.2d 811, 814–15.

We pointed out that a person who believes the force he uses is necessary to prevent imminent unlawful harm is justified in using such force if his belief is a correct belief; that if, on the other hand, the person reasonably but incorrectly believes that the force he uses is necessary, his use of force is excused. We concluded that decisive under our law is not whether a person's beliefs are correct, but rather whether they are reasonable and thereby excused or justified.

Although certain of the precepts applied in *Leidholm* may apply to circumstances similar to those with which we are concerned today, I do not understand that a specific instruction in the nature of *Leidholm* was requested. Rather, from the records before us, in those cases which were tried to a jury as well as those which were not, the defendants moved, prior to trial, to introduce evidence of opinions as to when life begins, methods of abortion and other matters which would support their position that their actions were necessary to prevent the death of unborn children.

When the motions for introduction of evidence were denied, it appears that no particular instruction was requested. Therefore these cases before us do not directly concern the issues of justification and excuse as defenses in the sense of *Leidholm*, but rather are concerned with the extent to which the trial court is required to permit evidence to be adduced to support those defenses. The trial court is given considerable latitude in determining the quantity of evidence to be introduced. *E.g., State v. Biby*, 366 N.W.2d 460 (N.D.1985). The *Leidholm* defenses are concerned not with the quantity of the evidence but with the reasonable belief of the defendants.

The defendants concede in their arguments that the necessity defense requires four basic elements, the first of which is the defendant must act voluntarily "and with an objective, rather than subjective, belief in the necessity of avoiding a greater harm." Thus the defenses in this case were not justification and excuse as described in *Leidholm* but were predicated on the premise that abortion is evil and that the act of trespassing causes less severe harm than does abortion. Unless the defendants can convince the United States Supreme Court of the validity of their position, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), effectively prevents us from concluding that abortion is a greater harm, notwithstanding the Supreme Court's statements that it need not decide when life begins and the belief of the defendants that life begins at conception.